FILED
2017 Jul-21  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

# (Plaintiff's Proposed First Amended Complaint in DeLoach Action)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| PHYSIOTHERAPY ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:16-cv-2014-VEH |
| JAMES DOUG DELOACH, | ) | |
| ATI HOLDINGS, LLC, ATHLETIC | ) | |
| & THERAPEUTIC INSTITUTE | ) | |
| OF NAPERVILLE, | ) | |
| LLC,  ATI HOLDINGS OF | ) | |
| ALABAMA, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Physiotherapy Associates, Inc. ("Physiotherapy" or "Plaintiff") states the following for its Amended Complaint against defendants James Doug DeLoach ("DeLoach"), ATI Holdings, LLC ("ATI Holdings"), Athletic & Therapeutic Institute of Naperville, LLC ("ATI of Naperville"), and ATI Holdings of Alabama, LLC ("ATI Holdings of Alabama") (collectively "Defendants"):

## The Parties, Jurisdiction and Venue

1.     Physiotherapy is a corporation organized under the laws of the State of Michigan with its principal place of business in the Commonwealth of Pennsylvania. Physiotherapy is an outpatient rehabilitation services company, providing a wide

1

range of services including, general orthopedics, spinal care, neurological rehabilitation, and physical, occupational, and speech therapy. Physiotherapy also provides athletic training services. Physiotherapy operates through numerous locations in Alabama, including multiple locations in this district.

2.      Defendant James Doug DeLoach is an individual resident of Talladega County, Alabama, whose residence address is 1688 Kahatchee Loop, Childersburg, Alabama. Until October 18, 2016, DeLoach was an employee of Physiotherapy, serving as an area vice president and, thereafter, a regional director. During DeLoach's employment with Physiotherapy he serviced accounts located within, and performed duties for Physiotherapy within, the Eastern Division of the Northern District of Alabama.

3.      Upon information and belief, Defendant ATI Holdings, LLC is an LLC organized under the laws of the State of Illinois with its principal place of business in the State of Illinois. Upon information and belief, ATI Holdings is an outpatient rehabilitation services company, providing services including, physical therapy, workers' compensation rehabilitation, and sports medicine, as well as athletic training services. Upon information and belief, ATI Holdings operates through several locations in Alabama.

4.      Upon information and belief, Defendant Athletic & Therapeutic Institute of Naperville, LLC is an LLC organized under the laws of the State of

Illinois with its principal place of business in the State of Illinois. Upon information and belief, ATI of Naperville is an outpatient rehabilitation services company, providing services including, physical therapy, workers' compensation rehabilitation, and sports medicine, as well as athletic training services. Upon information and belief, ATI of Naperville operates through several locations in Alabama.

5.     Upon information and belief, ATI Holdings of Alabama, LLC is an LLC organized under the laws of the State of Alabama with its principal place of business in the State of Illinois. Upon information and belief, ATI Holdings of Alabama is an outpatient rehabilitation services company, providing services including, physical therapy, workers' compensation rehabilitation, and sports medicine, as well as athletic training services. Upon information and belief, ATI Holdings of Alabama operates through several locations in Alabama.

6.     This Court has jurisdiction over DeLoach because he resides in Talladega County, Alabama, and worked for Physiotherapy in Alabama. Furthermore, this Court has jurisdiction over Defendants because the acts alleged herein occurred in Alabama. Personal jurisdiction is further proper because Defendants' acts as further described herein, have had, and threaten to continue to have, adverse impact on Physiotherapy in Alabama.

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Accounts for which DeLoach was responsible while employed with Physiotherapy generated more than $10 million annually.  Defendants' actions described below have subjected Physiotherapy to the loss of some of those accounts, to the loss of goodwill and damage to referral relationships and other injury that well exceeds the jurisdictional limit.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, in that defendant DeLoach resides in this district; a substantial portion of the events giving rise to Physiotherapy's claim occurred in this district; and Defendants are subject to the personal jurisdiction of the Court in this district.

### Statement of Facts

9.     DeLoach served as an employee of Physiotherapy from February 18, 2013 until his voluntary departure on October 18, 2016.

10.     DeLoach's original position with Physiotherapy was an area vice president for the Alabama region, and he eventually became a regional director.  In these positions, DeLoach had primary oversight for occupational and physical therapy operations for all of Physiotherapy's locations within the region.  He was responsible for networking with and developing and maintaining relationships with

customers, including, for example, referring physicians, physician groups, and other referral sources. Physiotherapy's primary referral sources are physicians and physician groups. DeLoach was also responsible for sports medicine outreach with colleges, universities and secondary schools within his region. In that position he was exposed to and developed, on behalf of Physiotherapy, important business relationships with personnel (including athletic directors, coaches, and physicians) at the said universities and schools. Physiotherapy would, as a result, receive referrals for physical therapy and other services, including athletic training, for the athletes of such universities and schools. Physiotherapy's competitors compete with Physiotherapy for referrals and relationships with physicians, physician groups, universities and schools, which was one of the principal areas of DeLoach's responsibility for Physiotherapy.

11. Physiotherapy's customers include, without limitation, the individuals to whom Physiotherapy is providing services, the physician groups whose outpatient rehabilitation practices Physiotherapy manages, the universities and schools with whom it contracts to provide athletic training services, and the physicians and physician groups that serve as Physiotherapy's referral sources.

12. Throughout his employment, DeLoach also had access to Physiotherapy's confidential and proprietary information, including, for example,

5

information concerning Physiotherapy's customers, Physiotherapy's business strategies, and Physiotherapy's financial and budget information.

13.    On or about March 4, 2013, DeLoach voluntarily executed an agreement with Physiotherapy (hereafter, "Agreement"), which provided terms for his employment and contained certain post-employment competitive restrictions.  A copy of the Agreement is appended hereto as Exhibit A and is incorporated herein by reference.

14.    In the Agreement, DeLoach agreed, *inter alia*, that during the term of his employment and for a period of twelve (12) months following termination for any reason, he would not:

a.    directly or indirectly be employed by or perform services for any business which performs outpatient rehabilitation services in any area within a ten mile radius of any of Physiotherapy's (or any of its affiliates') facilities at which DeLoach provided services during his employment, or for which DeLoach had management or supervisory responsibility while employed (Ex. A, ¶ 1);

b.    solicit, induce, or attempt to induce any past or current customer  or vendor of Physiotherapy to cease doing business with Physiotherapy or to do business with any other business which performs services materially similar to or competitive with those of Physiotherapy (*Id.* at ¶ 2); and

6

c.      induce or attempt to induce any associate of Physiotherapy to leave his or her employment with the company, or employ anyone who was an associate of the company at any time within the last six months of DeLoach's employment with Physiotherapy (*Id.* at ¶ 3).

15.     In the Agreement, DeLoach also acknowledged and agreed that these competitive restrictions were necessary to protect the legitimate business interests of the company; and that the said restrictions were reasonable in all respects. (*Id.* at ¶ 4).  He also agreed that the competitive restrictions would be tolled on a day-to-day basis for each day during which the periods were violated in any respect.  (*Id.*).

16.     Upon information and belief, sometime in August 2016, while still employed with Physiotherapy, DeLoach began communicating with ATI Holdings, ATI Holdings of Alabama, and ATI of Naperville (collectively "ATI") regarding potential employment with ATI.

17.     Upon information and belief, sometime in August 2016, DeLoach interviewed with ATI at ATI's corporate headquarters in Bolingbrook, Illinois.

18.     Upon information and belief, on August 18, 2016, DeLoach sent a copy of the Agreement to Craig Shelton, a recruiter for ATI.

19.     On August 25, 2016, while still an employee of Physiotherapy, DeLoach sent Brent Mack, the Chief Operating Officer of ATI, a document entitled

"Denovo and Acquisition Strategy.[1]"  The Denovo and Acquisition Strategy is an action plan drafted by DeLoach that advises ATI regarding potential development projects in the Alabama market.  The Denovo and Acquisition Strategy identifies six locations as immediate potential opportunities for ATI and provides insight as to why those potential opportunities would be successful.  Similarly, the Denovo and Acquisition Strategy identifies a number of post-12 month potential opportunities for ATI.  Upon information and belief, some, if not all, of the post-12 month opportunity locations are within the market area in which DeLoach worked while employed with Physiotherapy.  Through the Denovo and Acquisition Strategy, DeLoach provided ATI with information that would enable DeLoach and ATI to unfairly compete with Physiotherapy.  For example, the Denovo and Acquisition Strategy sets out information concerning: the identity of Physiotherapy's referral sources as well as information about Physiotherapy's referral sources, including, for example, the location of Physiotherapy's referral sources, the location of the referral sources' patient population, the amount of referrals received from particular referral sources, the growth strategy of particular referral sources, and the preferences of referral sources; information about Physiotherapy's growth, expansion, and acquisition strategy and opportunities; information about current and potential

---

[1] DeLoach has produced two versions of the DeNovo and Acquisition Strategy, which differ in content.

Physiotherapy customers, including referral sources, schools, universities, workers' compensation TPA's, and employers; and financial and budget information about Physiotherapy clinics. Upon information and belief, this information was obtained by DeLoach in the course of his employment with Physiotherapy. DeLoach's provision of the Denovo and Acquisition Strategy to ATI was done surreptitiously, and without the knowledge or consent of his employer, Physiotherapy.

20. Upon information and belief, ATI requested the Denovo and Acquisition Strategy from DeLoach. And, on August 25, 2016, ATI acknowledged receiving the Denovo and Acquisition Strategy noting that it was "good stuff."

21. Upon information and belief, by August 26, 2016, ATI had sent DeLoach an offer letter and employment agreement. Upon information and belief, on September 13, 2016, ATI sent DeLoach a final offer letter and employment agreement.

22. On September 19, 2016, DeLoach voluntarily resigned his employment with Physiotherapy but continued working for Physiotherapy for a thirty-day notice period. DeLoach's last day of employment with Physiotherapy was October 18, 2016.

23. Upon information and belief, DeLoach, with the knowledge and assistance of ATI, diverted potential opportunities from Physiotherapy to ATI while DeLoach was still employed with Physiotherapy. Such actions were done by

DeLoach surreptitiously, and without the knowledge and consent of his employer, Physiotherapy.

24.     For instance, upon information and belief, while still employed by Physiotherapy, DeLoach communicated with the University of South Alabama on behalf of ATI in order to discuss future development opportunities for rehabilitation and athletic training services.  Upon information and belief, ATI was a party to at least one such communication between DeLoach and the University of South Alabama.

25.     DeLoach began his employment with ATI on October 31, 2016, as Regional Director and Clinic Director.

26.     DeLoach's position with ATI, on information and belief, involves the same physician networking and sports medicine outreach functions that he performed for Physiotherapy.

27.     Upon information and belief, since becoming employed by ATI, DeLoach, has called on or made solicitations to many of Physiotherapy's customers, including Jacksonville State University ("JSU"), a physician group, and multiple area high schools.

28.     Since becoming employed by ATI, DeLoach, upon information and belief, has solicited many of Physiotherapy's employees.

29.     DeLoach has and will continue to compete against Physiotherapy, including using those business contacts that he maintained and nurtured during his employment with Physiotherapy and at Physiotherapy's expense to solicit business for ATI and to convince those referral sources of Physiotherapy to terminate or limit their business with Physiotherapy.  DeLoach is valuable to ATI because of his business and customer relationships developed through Physiotherapy and because he has knowledge of Physiotherapy's referral contacts and relationships that would only be known to an employee of Physiotherapy within the Alabama region. DeLoach's knowledge, derived at Physiotherapy's expense, has or will enable him to solicit and divert Physiotherapy's referral sources to the detriment of Physiotherapy and in violation of the Agreement.

30.     Upon information and belief, many of DeLoach's activities on behalf of ATI have been conducted within a ten mile radius of locations in which Physiotherapy maintains facilities, including at the St. Vincent's campus and the Greystone campus in Birmingham, Alabama, and its Oxford and Anniston, Alabama locations.

31.     Many of DeLoach's competitive activities are thus prohibited by the Agreement.  Additionally, DeLoach has solicited or attempted to do business with Physiotherapy's referral sources, in violation of the non-solicitation provisions of

the Agreement. DeLoach has appropriated for ATI a business relationship with JSU that he had developed for Physiotherapy.

32.     DeLoach's breach of the Agreement and Defendants' tortious conduct has and/or will result in significant financial losses to Physiotherapy. Physiotherapy is threatened with the loss of additional revenues if Defendants' breach of the Agreement and tortious conduct continues.  Defendants' conduct will also inevitably lead to loss of goodwill and ATI gaining knowledge of confidential company information regarding Physiotherapy and, among other things, its customers, including referral sources, universities, and schools.

**COUNT I**
**Breach of Contract**
**(DeLoach)**

33.     Plaintiff realleges each of the foregoing paragraphs as if set forth in full herein.

34.     DeLoach has breached and will continue to breach his Agreement with Physiotherapy by, among other things, competing against Physiotherapy within the prohibited area, and by contacting, soliciting, making proposals to, providing service to, or conducting business with Physiotherapy's referral sources and by soliciting Physiotherapy's employees.  DeLoach has or will use information and contacts he gained while employed by Physiotherapy to further these ends.

35. Physiotherapy was damaged and will continue to incur damages as a proximate result of DeLoach's actions.

## COUNT II
### Breach of Duty of Loyalty/Fiduciary Duty
### (DeLoach)

36. Plaintiff realleges each of the foregoing paragraphs as if set forth in full herein.

37. DeLoach was employed with Physiotherapy until October 18, 2016, and during that period owed a common law fiduciary duty of loyalty to Physiotherapy.

38. Prior to the termination of his employment with Physiotherapy, DeLoach acted in violation of his fiduciary duties and duty of loyalty to Physiotherapy by misappropriating and otherwise using Physiotherapy's confidential and proprietary information, by using Physiotherapy's time, money, and other resources to, at a minimum, misappropriate and otherwise use Physiotherapy's confidential and proprietary information, by failing to pursue opportunities for the benefit of Physiotherapy and/or by positioning himself to act on corporate opportunities for the benefit of himself and ATI, by taking and diverting business opportunities from Physiotherapy to ATI, by engaging in self-dealing, by intentionally interfering with Physiotherapy's business relationships, and by acting

on behalf of and in furtherance of the interests of ATI while still employed by Physiotherapy.

39.     The above-described actions were taken in bad faith, lacked the care that an ordinarily prudent person in a like position would exercise, and were contrary to the best interest of Physiotherapy, in violation of Alabama law.  Said actions were perpetrated while DeLoach was still employed by Physiotherapy and were done in anticipation of future competition against Physiotherapy.

40.     Physiotherapy was damaged and will continue to incur damages as a proximate result of DeLoach's actions.

41.     DeLoach's actions were taken intentionally, maliciously, and with intent to injury and/or oppress Physiotherapy, thereby entitling Physiotherapy to punitive damages.

## COUNT III
### Intentional Interference with Contractual/Business Relations
### (Defendants)

42.     Plaintiff realleges each of the foregoing paragraphs as if set forth in full herein.

43.     Defendants had actual knowledge of Physiotherapy's business relationships with its customers, including, for example, JSU.

44. After leaving the employ of Physiotherapy, DeLoach became employed by ATI. Upon information and belief, in his employment with ATI, DeLoach has called on and solicited Physiotherapy's customers, including, for example, JSU.

45. Defendants' conduct in engaging in the unlawful and wrongful acts described herein, including, without limitation, utilizing DeLoach to solicit Physiotherapy's customers in violation of his legal and contractual duties, constitutes unlawful, intentional interference with Physiotherapy's business relations between Physiotherapy and its customers, including, for example, JSU.

46. Defendants' interference is without justification.

47. Physiotherapy was damaged and may continue to incur damages as a proximate result of Defendants' actions.

## COUNT IV
### Aiding and Abetting
### (ATI)

48. Plaintiff realleges each of the foregoing paragraphs as if set forth in full herein.

49. DeLoach owed a common law fiduciary duty of loyalty to Physiotherapy and acted in violation of his fiduciary duties to Physiotherapy.

50. ATI knowingly participated in DeLoach's violation of his fiduciary duties to Physiotherapy.

51.    Physiotherapy was damaged and may continue to incur damages as a proximate result of Defendants' actions.

### COUNT V
### Conspiracy
### (Defendants)

52.    Plaintiff realleges each of the foregoing paragraphs as if set forth in full herein.

53.    All of the defendants have acted together, in concert with each other, in civil conspiracy to violate the aforesaid contractual and legal duties to Physiotherapy.

54.    Physiotherapy was damaged and may continue to incur damages as a proximate result of Defendants' actions.

### COUNT VI
### Intentional Interference with Contractual/Business Relations
### (ATI)

55.    Plaintiff realleges each of the foregoing paragraphs as if set forth in full herein.

56.    ATI had actual knowledge of the Agreement prior to hiring DeLoach.

57.    Despite said knowledge, ATI has employed DeLoach specifically to compete with Physiotherapy and to solicit Physiotherapy's customers and employees in violation of the Agreement.

58.     ATI's conduct in intentionally employing DeLoach to compete with Physiotherapy and to solicit Physiotherapy's customers and employees in violation of the Agreement constitutes unlawful interference with the Agreement.

59.     ATI's interference is without justification.

60.     Physiotherapy was damaged and may continue to incur damages as a proximate result of Defendants' actions.

THEREFORE, Plaintiff prays that this Court will enter judgment against Defendants and award the following relief:

A.     Compensatory damages in such an amount as the trier of fact determines;

B.     Punitive damages in such an amount as the trier of fact determines;

C.     Costs and attorneys' fees; and

C.     Such additional relief as this Court deems just and equitable.


/s/ John E. Goodman
John E. Goodman
jgoodman@bradley.com
One of the Attorneys for
Plaintiff

OF COUNSEL
Hillary C. Campbell
Stanley E. Blackmon
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
Email: hcampbell@bradley.com
Email: sblackmon@bradley.com

**Defendant to be served by process server at the following address**:

James Doug DeLoach
1668 Kahatchee Loop
Childersburg, AL  35044

ATI Holdings, LLC
c/o National Registered Agents, Inc.
208 So La Salle St
Suite 814
Chicago, IL 60604

ATI Holdings of Alabama, LLC
c/o CT Corporation System
2 North Jackson St
Suite 605
Montgomery, AL 36104

Athletic & Therapeutic Institute of Naperville, LLC
c/o National Registered Agents, Inc.
208 So La Salle St
Suite 814
Chicago, IL 60604


                                                                              /s/ John E. Goodman
                                                                 Of Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Matt Carroll
F. Inge Johnstone
JOHNSTONE CARROLL LLC
2204 Lakeshore Drive, Suite 302
Homewood, Alabama 35209
Telephone: 205-383-1372
mcarroll@johnstonecarroll.com
ijohnstone@johnstonecarroll.com

_____
/s/ John E. Goodman
OF COUNSEL

# Exhibit A

# Physiotherapy
## Associates

H2030

Phone: 610-644-7824   Fax: 267-321-2076

Whiteland Business Center • 855 Springdale Drive, Suite 200 • Exton, PA 19341

January 14, 2013

**PERSONAL AND CONFIDENTIAL**

James DeLoach
1668 Kahatchee Loop
Childersburg, AL 35044

Dear James,

On behalf of Physiotherapy Associates (the Company) I am pleased to offer you a full time position as an **Area Vice President** in our Alabama Region location.  James, we are very excited you are joining our team!

### Welcome to Physiotherapy Associates

This offer letter confirms the terms of your employment in which you will be an employee at will effective **Monday, February 18, 2013** and is contingent upon the successful completion of a reference check and background investigation.   It is not intended to create an employment contract and the terms/conditions of your employment may be changed at the Company's discretion.  Employment with the Company is on an at will basis.  This means that you are not employed for a set period of time, and you or the Company may terminate your employment at any time and for any reason.

### About Your Position

As an Area Vice President you report directly to William Hall, Regional Vice President (your Manager).  You are scheduled to work 40 hours per week, or as needed by your Manager.  As an exempt Associate you are ineligible for overtime pay in excess of forty (40) hours actively worked each week and in accordance with local and state law.

### Compensation

Your starting rate of pay for this position is a base annual salary of **$160,000.00** which is paid to you bi-weekly at a rate of **$6,153.85** as long as you maintain an active work status.  Associates are currently paid one week in arrears on a bi-weekly basis, every other Friday.  Applicable payroll deductions as required by state and federal law will be withheld from your paycheck, along with any voluntary deductions you authorize.  By signing this offer letter, you authorize the Company, to the extent permitted by law, to deduct from your wages or other payments otherwise due you, the deductions associated with any voluntary participation by you in the Company sponsored benefit programs requiring such deductions.

As an Area Vice President, you are eligible to participate in the Company's **industry-leading Field Operations Incentive Plan** (the Plan) and may earn additional compensation.  The Profit Sharing amount is determined by position and is detailed in the attached Plan document.   As noted in the Plan document, the payout is based on the performance of your assigned group or clinic(s).  Your eligibility to participate in the Plan begins upon your date of hire but your payment will be prorated to reflect the portion of the measurement period you actually worked.  Changes to your work status or position may change or eliminate your eligibility to continue participation in the Plan. When Profit Sharing payouts are distributed, you must be actively working and employed with the Company on the payment date to receive a payment unless otherwise noted in the Plan.

_____*Initials*

## Benefits

As an Area Vice President, you are eligible to participate in all benefit programs the Company offers its similarly situated Associates. You are eligible to participate on the first of the month following thirty (30) days of active employment. **It is critical for you to select your benefits within your first thirty (30) days of employment.** If you fail to complete the election process on or before thirty (30) days of employment, you are unable to participate in the benefit plans until the next annual open enrollment/election period. Information regarding the Company's current benefit programs is included in the "New Hire" packet provided to you with this offer letter. The terms and conditions of benefit programs applicable to you are reviewed regularly by the Company and are subject to change.

In order to assist Associates to save for their retirement years, the Company offers a 401(k) Plan which includes an "automatic enrollment" feature. If you do not make enrollment choices regarding the 401(k) Plan within your first thirty (30) days of employment, you will be **automatically enrolled with a 3% deduction rate** from each pay and your contributions will be invested in a company designated mutual fund.

## First Day of Employment and New Hire Paperwork

Important new hire paperwork is included in a "New Hire" kit provided to you with this offer letter. **Please review this information carefully, complete the necessary paperwork and bring it with you on your** <u>first day</u> **of employment.** Please note, as a condition of your employment and in compliance with the Immigration Reform and Control Act (IRCA) of 1986, **we must verify your eligibility for employment in the United States within three (3) days after your employment commences or we cannot continue your employment.** A list of acceptable documents which provide proof of your identity and eligibility to work in the United States can be found on the back of the Form I-9 included in the "New Hire" packet. These documents along with the completed form should be brought with you when your "New Hire" paperwork is submitted.

## Orientation

**All new Associates are required to attend New Associate Orientation within thirty (30) days of hire.** New Associate Orientation will provide an overview of the company structure, company history and benefits ,and is critical to your success as an Associate of the Company. New Associate Orientation webinar information is included in your new hire packet.

## Compliance Training

The Company is committed to conducting business in compliance with all applicable laws and regulations and in accordance with the highest ethical standards. All Associates and officers of the Company are responsible for complying with the Company's Corporate Integrity Agreement, applicable laws, policies, procedures and all compliance programs. **All Associates and officers of the Company are required to complete the Compliance Program Training within thirty (30) days of hire.** Additionally, all Associates must confirm, on an annual basis, they understand and are complying with federal, state and local laws and Company policies and procedures. The Compliance Training Program can be found by clicking the "Gen 21 Training" link on the home page of iZone, the Company's intranet site.

## Health Insurance Portability and Accountability Act (HIPAA)

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) establishes rights and protections for health care consumers and creates responsibilities for health plan sponsors. The HIPAA Privacy Rule governs the use and disclosure of Protected Health Information (PHI), which is individually identifiable health information. Included in your "New Hire" kit will be various documents related to HIPAA. Please review these documents since they pertain to the privacy of your healthcare information and relevant privacy practices. If you have any questions regarding HIPAA, do not hesitate to contact your Human Resources Representative.

*Initials*

### Non-Compete and non-solicitation

As a condition of your employment and other good and valuable consideration, the receipt of which is understood and acknowledged by signing this offer letter, the Company desires to receive from you the following covenants and by signing this offer letter you grant the following covenants during your employment and for a period of twelve (12) months following termination for any reason whatsoever:

(a) not to engage, directly or indirectly, in competition with the Company;

(b) not to solicit any Associate of the Company to terminate his or her employment with the Company; and

(c) not to solicit any vendor or customer of the Company to terminate his or her relationship with the Company.

The above referenced covenants are more fully set forth below. By signing this offer letter and accepting employment with the company you are agreeing to be legally bound and obligated to comply with the following covenants:

      1.   **Covenant Against Competition** - During the term of your employment with the Company and for a period of twelve (12) months from either your voluntary termination or involuntary termination of Associate's employment by the Company for Due Cause (as defined on below), you will not, directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with the ownership, management, operation, or control of, any business which performs outpatient rehabilitation or orthotics or prosthetic services in the Market Area (as defined below); provided, however, you may own up to one percent (1%) of any publicly held company; and provided, further that the foregoing exception to prohibited activities is not excepted from, and remains subject to, the terms and restrictions in Sections 2 and 3 hereof.

The term "Market Area" means the area that is within a ten (10) mile radius of any of the Company's facilities (or any Company affiliate's facilities) at which you provided services during your employment with the Company or for which you had, during any portion of the term of your employment, management or supervisory responsibility. A "Company affiliate" refers to any entity that is controlled by or under common control with the Company.

For purposes of this covenant, "Due Cause" means (a) your failure or refusal to perform specific job duties reasonably required in connection with your position, provided that such failure or refusal continues or reoccurs after the Company notifies you in writing of such failure or refusal; (b) your engagement in fraud, sexual harassment, substance abuse or any other violation of the Company's Code of Conduct or other written policy of the Company; (c) the appropriation (or attempted appropriation) of a material business opportunity of the Company, including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Company; (d) the misappropriation (or attempted misappropriation) of any of the Company's funds or property; (e) dishonesty, willful misconduct, material neglect of the Company's business after written notice from the Company and a reasonable opportunity to cure, conviction of a felony or other crime involving moral turpitude, misappropriation of funds or habitual insobriety; or (f) revocation, suspension or other loss of your license to provide rehabilitation services in the state in which you provide such services.

      2.   **Non-solicitation of Customers and Vendors** - During the term of your employment with the Company and for a period of twelve (12) months from the termination of your employment with the Company for any reason whatsoever, you shall not solicit, induce, or attempt to induce any past or current Customer or vendor of the Company to (a) cease doing business in whole or in part with or through the Company, or (b) do business with any other person, firm, partnership, corporation, or other entity which performs services materially similar to or competitive with those provided by the Company. For purposes of this covenant the term "Customer" means any person, division or unit of a business

*DW* Initials

enterprise with whom within a two (2) year period preceding the date of termination of your employment with the Company, the Company had received services from Company or held a business or contractual arrangement to perform services for Company.

    3.    **Non-solicitation/No-Hire of Associates** - During the term of your employment with the Company and for a period of twelve (12) months from the termination of your employment with the Company for any reason whatsoever, you will not, either on your own account or for any person, firm, partnership, corporation, or other entity (a) solicit, interfere with, or endeavor to cause any Associate of the Company to leave his or her employment, (b) induce or attempt to induce any Associate of the company to breach his or her covenant or agreement with the Company, or (c) employ any person who was a director, officer or Associate of the Company or any of its subsidiaries on the date of your termination or at any time during the six (6) month period immediately prior to such termination.

    4.    **Governing Law** - It is understood and agreed that the construction and interpretation of this Agreement shall, at all times and in all respects, be governed by the internal laws of the Commonwealth of Pennsylvania, without giving effect to the conflict of laws provisions thereof.

By signing this offer letter and accepting the offer of employment, you are acknowledging and agreeing that the restrictions related to non-competition, non-solicitation and no-hire are necessary to protect the legitimate business interests of the Company. You are further acknowledging, a) that all of the restrictions related to non-competition, non-solicitation and non-hire are reasonable in all respects, including duration, territory and scope of activity and b) that the injury the Company will suffer in the event of the breach or threatened breach by you, will cause the Company irreparable injury that cannot be adequately compensated by monetary damages alone. Therefore, you agree that the Company, without limiting any other legal or equitable remedies available to it, would be entitled to obtain equitable relief by injunction or otherwise, without the posting of any bond, from any court of competent jurisdiction, including, without limitation, injunctive relief to prevent your failure to comply with the terms and conditions of the non-competition, non-solicitation and non-hire covenants. By signing this offer letter you agree the restriction periods referenced in the covenants above will be tolled on a day-for-day basis for each day during which the provisions are violated in any respect, so that you are restricted from engaging in the activities prohibited by the covenants for the full stated periods. By signing this offer letter you further agree that (a) the covenants contained above are necessary for the protection of Company's business goodwill, confidential and proprietary information and trade secrets, and (b) a portion of the compensation paid to you is paid in consideration of the covenants herein contained, the sufficiency of which consideration is hereby acknowledged.

## *Associate Handbook*

The Company provides an Associate Handbook (the Handbook) on the Company's Intranet known as iZone. If you have any problems accessing the on-line Handbook, contact Human Resources for assistance. Once you begin employment, you are required to familiarize yourself with the Handbook and comply with all of the policies contained therein. The Handbook contains general guidelines governing employment with the Company and does not create a contract of any sort. Because the Handbook contains general guidelines, in appropriate circumstances, the Company may choose to vary from any policy stated in the Handbook, based on the particular facts and circumstances of the situation and the Company may change any of the policies in the Handbook at any time. If you have any questions about the Handbook, you should direct them to your Manager or Human Resources. Please note, the Handbook is revised and updated periodically. Therefore, you should review the Handbook regularly in order to be aware of all revisions and updates. In addition, all Associates are required to review the Handbook, at minimum, annually.

**If the terms of this offer letter are acceptable to you, please indicate your acceptance of this offer, by initialing each page of the offer letter and signing in the space provided on the signature page attached. Please return the original signed offer letter to the Human Resources Department at the following fax number prior to your start date:**

*DD***__***Initials*

## 267-321-2054

The signed offer letter must be received by the Human Resources Department in order for you to initiate employment.

James, welcome to Physiotherapy Associates! We look forward to many years of collaboration with you as the Company continues to grow. If you have any questions about the Company, the position or this offer letter, please contact me at (678) 475-5411.

Sincerely,

*Ray Smith*

Ray Smith
Regional Recruiter

*Initials*

OFFER LETTER
SIGNATURE PAGE

**Associate Name: James DeLoach**
**Associate Title: Area Vice President**
**Date of Hire: 2/18/2013**
**Work Location: Alabama Region**
**Manager: William Hall**

I ACCEPT THE TERMS OF EMPLOYMENT AS DESCRIBED IN THIS LETTER.

I UNDERSTAND THAT NONE OF THE POLICIES OR STATEMENTS CONTAINED WITHIN THE ASSOCIATE HANDBOOK AS WELL AS ALL COMPANY AND DEPARTMENTAL GUIDELINES AND/OR POLICIES SHALL BE CONSTRUED TO CREATE A CONTRACT OF EMPLOYMENT, EITHER EXPRESS OR IMPLIED. THERE IS NO IMPLIED PROMISE OR COMMITMENT BY THE COMPANY TO CONTINUE EMPLOYMENT FOR ANY LENGTH OF TIME OR TO ALTER THE AT-WILL EMPLOYMENT RELATIONSHIP.

AGREED TO AND ACCEPTED BY:

James DeLoach

$\underline{S\ 4-13}$
Date

_____*Initials*